WILLIAM T. ANDERSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anderson v. Commissioner
Docket No. 7408-70.
United States Tax Court
T.C. Memo 1973-155; 1973 Tax Ct. Memo LEXIS 134; 32 T.C.M. (CCH) 762; T.C.M. (RIA) 73155; July 12, 1973, Filed William A. Barnett, for the petitioner. William L. Ringuette, for the respondent. QUEALY
*136 MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent has determined the following deficiencies and additions to the Federal income tax of petitioner for the taxable years 1954 through 1965: Prepayment Credit Adjustment
Year
Statutory
Tax Withheld
F.I.C.A. Tax
Net Additional
Deficiency
Credit
Tax
1954
$10,482.17
$5,767.00
$72.00
$4,643.17
1955
8,136.68
4,990.00
84.00
3,062.68
1956
11,092.16
6,920.00
84.00
4,088.16
1957
17,48 3.80
7,811.00
94.50
9,578.30
1958
14,820.58
6,776.50
94.50
7,949.58
1959
28,338.41
10,776.00
120.00
17,442.41
1960
40,016.57
13,728.00
144.00
26,144.57
1961
30,191.23
11,728.00
144.00
18,319.23
1962
37,800.83
13,716.00
150.00
23,934.8 3
1963
52,599.60
17,179.00
174.00
35,246.60
1964
49,582.79
18,036.00
174.00
31,372.79
1965
35,487.35
16,456.00
174.00
18,857.35
$336,032.17
$133,883.50
$1,509.00
$200,639.67
Additions to the Tax
Year
Sec. 6653(b)
Sec. 6654 1954
Sec. 294(d) (1)
1954 Code
Code
(A) 1939 Code
1954
$5,241.08
$429.50
1955
4,068.34
$24.87
1956
5,546.08
30.42
1957
8,741.90
173.33
1958
7,410.29
140.13
1959
14,169.20
357.63
1960
20,008.28
565.44
1961
15,095.61
370.47
1962
18,900.41
503.78
1963
26,299.80
778.66
1964
24,791.40
659.91
1965
17,743.67
328.45
$168,016.06
$3,933.09
$429.50
*137 3 Certain concessions having been made by the parties, the issues remaining for decision are as follows: (1) Whether petitioner is entitled to deductions in excess of those allowed by respondent for the taxable years 1954 through 1963. (2) Whether petitioner is entitled to the benefits of a joint return election under section 6013(a) [1] for the taxable years 1954 through 1965. (3) Whether respondent is justified in asserting additions to petitioner's tax under section 6653(b) for the taxable years 1954 through 1965. (4) Whether petitioner is subject to additions under section 294(d) (1) (A) of the 1939 Code and under section 6654 of the 1954 Code for failure to file timely declarations of estimated tax for the taxable year 1954 and for underpayment of estimated tax for the taxable years 1955 through 1965, respectively. 4 FINDINGS OF FACT The facts are fully stipulated. The stipulations together with the exhibits attached thereto are incorporated herein by reference. William T. Anderson (hereinafter "Anderson" or "petitioner") resided in *138 Arlington Heights, Illinois, at the time of the filing of the petition. Anderson was born in Minneapolis, Minnesota, in the year 1917. He attended the University of Minnesota and majored in engineering, but left after one year to accept a job as a junior draftsman for Continental Machines of Minneapolis. He worked for Continental Machines until 1940 when he was transferred to DoALL Company of Des Plaines, Illinois (hereinafter sometimes referred to as "DoALL"). Anderson has remained within the DoALL organization ever since. He currently serves as its vice-president in charge of engineering and product development. His duties include the establishment of new foreign manufacturing and sales corporations in Sweden, England, Switzerland, and various other countries. 5 In addition to his position at DoALL, Anderson also served as president of Contour Saws, Inc., a related corporation, until 1965, at which time he became vice-chairman of its board of directors. He was listed as an officer of DoALL of Canada and of several other corporations within the DoALL organization, but received no income from these corporations. During the years in question, Anderson's only sources *139 of income were his salary and bonuses from DoALL Company and Contour Saws, Inc., and the interest he received from a joint savings account he maintained with his wife. He received W-2 Forms from both corporations for each year in question. The amounts Anderson received from each source were as follows: Taxable
DoALL Company
Contour Saws, Inc.
Interest
Total Gross
Year
Income
Income 1954
$9,004.00
$20,059.00
--
$29,063.00
1955
5,004.00
20,061.50
--
25,065.50
1956
5,004.00
25,064.00
--
30,068.00
1957
6,000.00
34,062.50
$89.50
40,152.00
1958
11,861.00
24,065.00
128.74
36,054.74
1959
25,996.00
2 9,067.50
461.04
55,524.54
1960
35,996.00
34,070.00
737.30
70,803.30
1961
25,996.00
34,070.00
758.47
60,824.47
1962
35,996.00
34,072.50
723.60
70,792.10
1963
38,002.00
49,575.00
1,585.36
89,162.36
1964
40,004.00
52,077.50
1,887.86
93,969.36
1965
20,004.00
62,080.00
1,004.01
83,088.01 6 During all the years in question, Anderson was married and had three dependent children. He and his wife resided in Des Plaines, Illinois, until 1957, when he sold his home, subject to a $10,000 mortgage, for *140 approximately $18,000 and moved to Long Grove, Illinois. He rented a home there until October of 1964, when he purchased his present home in Arlington Heights, Illinois, for $73,000. He paid $40,000 down and obtained a mortgage on the balance. His mortgage payments amounted to approximately $300 per month. Anderson did not file Federal income tax returns for the taxable years 1954 through 1965. Nor did he file any estimated tax declarations or make any payments of estimated tax pursuant thereto for the same period. Prior to the taxable year 1954, Anderson prepared and regularly filed his own returns. In November of 1966, Revenue Officer George Pistanowich (hereinafter referred to as "Revenue Officer Pistanowich") was assigned to contact Anderson concerning his income tax return for 1963. The first interview held between Anderson 7 and Pistanowich on December 7, 1966, was brief, lasting only about fifteen minutes. In response to Pistanowich's questions concerning his 1963 return, Anderson admitted that he had not only failed to file his 1963 return, but also the ones for 1962, 1964, and 1965. He stated that he could not remember the last time he had filed a Federal *141 income tax return. When asked why he had not filed these past returns, Anderson replied, "I have no excuse." Anderson was interviewed again on February 20, 1967, this time by Special Agent Richard C. Wassenaar of the Intelligence Division of the Internal Revenue Service (hereinafter referred to as "Special Agent Wassenaar"). Special Agent Wassenaar was accompanied by Revenue Officer Pistanowich. During the course of the interview, Anderson acknowledged that he had not filed a Federal income tax return or a declaration of estimated tax since approximately 1954. [2] He again repeated he had "no excuse" for not filing 8 returns during this period. He had prepared a return for 1954, but decided not to file it since the funds available at that particular time were not "in excess," [3] and he did not want to deprive his family of their customary standard of living by paying the tax out of funds that would ordinarily inure to them. His salary at that time was approximately $1,000 or $1,100 per month. Anderson did not recollect the exact amount of additional tax due, but believed it was a relatively small amount which he could have paid with the funds available. *142 Anderson stated that he did not file any returns for the subsequent years because he could not bring himself to truthfully answer the question on the face of each return asking if he had filed a return for the previous year. One year after another passed in like manner. He 9 attempted to rationalize his behavior by saying that his withholdings were sufficient to cover the tax due, but he knew that this was not true. He analogized his behavior to that of "an ostrich sticking his head in the sand" hoping that the danger around him would go away by itself. Each year he expected that the Internal Revenue Service would catch up with him, but hoped that it would not be until the following year. He admitted that he probably had sufficient funds available to pay any additional tax due though he did not specifically compute the tax owing. Anderson said he did not file estimated tax declarations for any of the years in question because he felt that the Internal Revenue Service would surely inquire about his failure to file his regular income tax returns. He did not discuss his failure to file returns with anyone, including his wife. He did not approach the head of the tax department *143 of DoALL Company for advice because he did not want anyone at the compnay to know of his predicament. 10 Anderson provided Special Agent Wassenaar with the W-2 Forms he received from DoALL Company and Contour Saws, Inc., for the years 1960 and 1965. The W-2 Forms received for the other years in question were apparently lost during his move from Long Grove to his present residence in Arlington Heights in October of 1964. In addition, he said that most of his records relating to various deductible expenses incurred during the years in question were also lost in the move. He explained that the only assets he owned, besides his residence, were two automobiles (a 1964 Continental and a 1966 Mustang), his household furnishings and personal effects, a checking and savings account at First National Bank of Des Plaines, and a vacant piece of realty in the Inverness section of Palatine Township, which he acquired in 1952. During the course of the interview, Special Agent Wassenaar explained the purpose of the investigation was to gather facts to determine whether there had been a possible criminal violation of the Internal Revenue Code. He said most investigations were very detailed *144 to ensure 11 all relevant facts were brought to light. Anderson replied that he was ready to face reality and wanted to go on record as being completely willing to cooperate with the investigation in order to bring matters to a quick resolution. Anderson provided Wassenaar with the names of persons to contact within the DoALL organization to obtain the necessary employment records for the years in question, but requested that he make an attempt to do so as discreetly as possible. In addition, Anderson said he would make an attempt on his own to obtain copies of his W-2 Forms as well as any of his past paychecks from both companies. Anderson was interviewed for a third time on April 4, 1967, by Special Agent Wassenaar and by Revenue Agent Curtiss Elliott of the Audit Division of the Internal Revenue Service (hereinafter referred to as "Revenue Agent Elliott"). Anderson took this occasion to provide the agents with photostatic copies of all the W-2 Forms received from DoALL Company and Contour Saws, Inc., for the years 1958 through 1966. He said he was unable to find any records to indicate the last year he had filed an income 12 tax return. In addition to the assets *145 previously mentioned in the prior interview, he disclosed that he also owned two life insurance policies with New York Life and Home Life, totalling $90,000. He acknowledged that his wife's excessive spending habits were a constant drain on his earnings. Although his savings account usually had a substantial balance, his wife was continually drawing on their joint checking account. Indeed, she wrote nearly all of the checks drawn on the account. He found it difficult to keep up with her spending habits, but had failed to persuade her to spend less. When asked about the deductible expenses he might be entitled to during the years in question, Anderson indicated he gave relatively little to churches, educational institutions, or other charitable organizations. The only interest expense he had incurred since the 1950's related to the $30,000 mortgage on his present home obtained in the latter part of 1965. Except for the usual state sales and gasoline tax deductions, and the taxes on his vacant property in Inverness, he knew of no other deductible taxes to which he was entitled. He did not begin paying 13 real estate taxes on his present residence until 1966. All the *146 expenses he incurred in connection with his employment were fully reimbursed. At the close of the interview, however, Anderson suggested that he might benefit by itemizing in 1965. He had expended some $5,000 that year in hospital expenses for his son, Jim, who was suffering from certain emotional and physical difficulties at the time. Anderson met with Special Agent Wassenaar and Revenue Agent Elliott twice more in April. He presented all his cancelled personal checks from the years 1964 through 1965, and identified those which he considered to be deductible. He calculated that his family had driven approximately 15,000 miles each year which involved the purchase of 1,000 gallons of gasoline. He estimated his sales taxes for 1964 and 1965 to be about $1,200 for each year but would present a final figure at the next meeting after he had examined his cancelled checks more thoroughly. He said he was unable to find any cancelled checks from the years prior to 1964, but did not feel 14 that they were too necessary since he doubted whether his deductible expenses in those years exceeded the standard deduction. [4]
*147 Anderson met with Special Agent Wassenaar and Revenue Agent Elliott for the last time on June 20, 1967. The results of his computations indicated he had paid sales taxes of $2,728 in 1964 and $2,040 in 1965. He estimated that his sales taxes for 1962 and 1963 were similar in amount. Anderson was then present with forms for the taxable years 1962 through 1965 on which he was permitted to list the amounts of sales taxes and all other deductible expenses to which he felt he was entitled. In determining Anderson's taxable income for the years 1954 through 1960, the respondent allowed him a $3,000 personal exemption for himself, his wife, and three children. Respondent also determined that Anderson 15 was only entitled to the $500 standard deduction since he had failed to prove he had any deductions in excess thereof. In determining Anderson's taxable income for the years 1961 through 1963, respondent again allowed him a $3,000 personal exemption for himself and his family. Respondent accepted Anderson's estimates and allowed him a $500 charitable deduction and a $2,829.50 deduction for sales and gasoline taxes for each year. The parties have stipulated into evidence *148 "Statistics of Income" compiled by the Internal Revenue Service. The statistics indicate the total itemized deductions claimed by taxpayers in Anderson's income class group for the taxable years 1954 through 1963. Respondent calculated Anderson's deficiency for the years 1954 through 1965 using the rates prescribed for married persons filing separately. On January 29, 1969, Anderson entered a plea of guilty to the charge of willfully failing to file Federal income tax returns for the years 1963, 1964, and 1965, in violation of section 7203. 16 The failure of Anderson to file a Federal income tax return for each of the taxable years 1954 through 1965 was willful and due to fraud. At least a part of the deficiency for each year was due to fraud. OPINION Petitioner was a successful businessman. He held positions of high responsibility with both DoALL Company and its related corporation, Contour Saws, Inc., during the taxable years 1954 through 1965. His salaries and bonuses from these two corporation reflected a steady increase, ranging from a low of $29,063, in 1954, to a high of $92,081.50, in 1964. He received W-2 Forms each year from both corporations indicating *149 the salary he received and the amounts withheld for taxes. He was well aware of his obligation to file an income tax return for each of the years in question since he had made out his own returns prior to 1954. He also realized that the amounts withheld from his salary were not sufficient to cover his tax liability. 17 He did make out a return for the taxable year 1954. However, he decided not to file it since he did not have a surplusage of funds on hand at the time, and he did not want to deprive his family of the standard of living to which they were accustomed by depleting funds which would ordinarily inure to their benefit. He did not file returns for the years subsequent to 1954 because he could not bring himself to truthfully answer the question on the face of each return asking whether he had filed a return for the prior year. He did not file an estimated declaration for each of the years in question in order to avoid the inquiries which he felt would surely follow from his failure to file a return for that year. Petitioner characterized his actions as those of "an ostrich sticking his head in the sand" hoping that the problem would go away. Petitioner was *150 clearly caught in a web of his own making which became larger and larger as each year passed. 18 Respondent's preliminary investigations in November of 1966 into petitioner's 1963 return led to the discovery of petitioner's delinquency in filing returns for the years 1954 through 1965. On the basis of information received from petitioner during a series of interview, respondent determined petitioner's tax liability for each of the years in question and asserted additions thereto. The issues for our decision are as follows: (1) whether petitioner is entitled to deductions for the taxable years 1954 through 1963 in excess of amounts allowed by respondent; (2) whether the petitioner is entitled to the benefits of a joint return election under section 6013(a) for the taxable years 1954 through 1965; (3) whether petitioner is liable for additions to tax for fraud under section 6653(b); and (4) whether petitioner is liable for additions to tax for failure to file a declaration of estimated tax for 1954 and underpayment of estimated tax for 1955 through 1965. 19 Allowable Deductions, 1954 through 1963 Petitioner does not dispute the $3,000 exemption allowed in each of *151 the years 1954 through 1965 for himself, his wife, and his three children. He does, however, argue that he is entitled to deductions in excess of the $500 standard deduction allowed in each of the taxable years 1954 through 1960 and the $3,329.50 of itemized deductions allowed in each of the taxable years 1961 through 1963. It is well established that petitioner has the burden of proving that respondent's determinations are incorrect. Welch v. Helvering, 290 U.S. 111 (1933). Turning first to the taxable years 1954 through 1960, we find petitioner has failed to show that he is entitled to any deductions in excess of the $500 standard deduction allowed under section 141 for each of these years. Petitioner has freely acknowledged in his interview with Special Agent Wassenaar that he gave little to educational institutions, churches, and charitable organizations. He admitted he had no interest expense during 20 these years and paid only a small amount of real estate tax on his vacant Inverness property. He estimated that he drove 15,000 miles per year which required the purchase of 1,000 gallons of gasoline. With Illinois gasoline tax being 5 cents per gallon *152 during the years in question, this would only result in a $50 itemized deductions allowed in the years 1961 through 1963, and claims that he incurred like amounts in the years 1954 through 1960. Petitioner overlooks the well established rule that each year is a separate unit for tax purposes. United States v. Lewis, 340 U.S. 590 (1951); North American Oil v. Burnet, 286 U.S. 417 (1932). The fact that petitioner was allowed certain deductions for 1961 through 1963 does not necessarily entitled him to deduct similar amounts in prior years. We do not know the circumstances which gave rise to petitioner's large sales tax deductions in 1961 through 1963. We cannot, however, assume that the same such circumstances existed in the years 1954 21 through 1960. The record before us is devoid of any evidence in the form of records, cancelled checks or testimony from which we might conclude that petitioner incurred the same amounts of sales taxes in the years 1954 through 1960, as he did in 1961 through 1963. Petitioner has directed our attention to "Statistics of Income" compiled by the Internal Revenue Service. The statistics indicate the total amounts of *153 deductions taken by taxpayers in petitioner's income class group for the taxable years 1954 through 1963. It is possible to compute from these figures the percentages of adjusted gross income claimed as itemized deductions by the "average" taxpayer in petitioner's income class group for each year. Petitioner points to these figures as demonstrating that he, as an "average" taxpayer within his income class, incurred deductible expenses far in excess of the $500 standard deduction used by the respondent for these years. He contends that the Court should therefore make an approximation of his deductible expenses for 1954 through 1960 under the principles enunciated in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). 22 Petitioner has read Cohan too broadly. In Cohan, the court directed an approximation of the taxpayer's expenses because it was convinced that the taxpayer had actually incurred such expenses but had no records to substantiate them.Here, however, petitioner has presented no evidence whatsoever which would indicate that he actually incurred any expenses in excess of the $500 standard deduction allowed in the years 1954 through 1960. His reliance *154 on the "Statistics of Income" as demonstrating that he incurred such expenses is unfounded. These statistics indicate only the average amount of deductions taken by a taxpayer in petitioner's adjusted gross income class. They in no way establish that petitioner himself incurred any expenses. Under such circumstances, we find no grounds for applying the Cohan rule. Respondent's determination that petitioner has not shown he is entitled to deductions in excess of the $500 standard deduction for the years 1954 through 1960 is accordingly sustained.
Petitioner argues that if the standard deduction under section 141 is to be used, he is at least entitled 23 to the $1,000 deduction. For reasons explained later in this opinion, petitioner is not entitled to the benefit of joint return rates under section 6013 and is therefore limited to the $500 standard deduction used by married individauls filing separately. Turning next to the taxable years 1961 through 1963, we again find that petitioner has presented no evidence which would indicate that he is entitled to deductions in excess of those allowed by respondent for these years.
In his meetings with Special Agent Wassenaar during *155 April and June of 1967, petitioner was asked to estimate all the deductible expenditure he incurred in the years 1962 and 1963. He was given full opportunity to list the amounts he felt he was entitled to deduct. Respondent accepted all petitioner's estimates for these years without challenge. This was so in spite of the fact petitioner could present no records to substantiate such estimates since all his records 24 and checks for these years were admittedly lost in his move to Arlington Heights in October of 1964. [5]
With respect to 1961, petitioner was allowed the same amount of deductions for that year as for 1962 and 1963. This seems generous considering the facts before us do not indicate that petitioner had any records to support such allowances nor offered any estimates of his deductions for such year. Indeed, respondent allowed petitioner *156 a $500 charitable deduction for all three years, 1961 through 1963, in spite of petitioner's statements that he gave relatively little to educational institutions, churches, or charities.
Petitioner has presented the Court with no evidence whatsoever which would indicate that he is entitled to deductions in excess of those allowed for the years 1961 25 through 1963. Respondent's determinations for these years are accordingly upheld. Petitioner's argument that deductions should be allowed based on the so-called "Statistics of Income" and the Cohan rule is rejected for the same reasons as given above with respect to the years 1954 through 1960. Joint Return Election, 1954 through 1965 The second issue before the Court is whether petitioner is entitled to the benefits of a joint return election under section 6013(a) for the taxable years 1954 through 1965. Section 6013(a) provides, in pertinent part, as follows: (a) Joint Returns. - A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, except as provided below: * * * Petitioner contends that respondent should have *157 given him the benefit of the joint return election in computing his deficiency for the years 1954 through 1965. We disagree. The statute clearly predicates 26 the benefits of joint rates on the making of a joint return. No other method for obtaining the benefits of a joint return election is provided. Dritz v. Commissioner, 427 F. 2d 1176 (C.A. 5, 1970), affirming a Memorandum Opinion of this Court on all issues. Here, petitioner has at no time filed a joint return for any of the years in question and is therefore not entitled to the benefits of a joint return election under section 6013(a). Anderson's request in the petition to be taxed on joint rates is not the equivalent of making a joint return. Our construction of section 6013(a) is supported by the fact that both respondent's authority to issue a joint deficiency notice under section 6212(b) (2) and his authority to compute tax on joint rates under section 2(a) is limited to circumstances where a joint return has been filed by taxpayers. Dritz v. Commissioner, supra. Petitioner argues alternatively, that the respondent should have prepared a joint return for himself and his wife under section *158 6020(a) prior to the issuance of the statutory notice. We disagree. First, the language of section 6020(a) is permissive, not mandatory, in nature. 27 Secondly, there is no evidence in the record which would indicate that petitioner's wife was ever required to make any return for the years in question. Moreover, there is no indication that she ever consented to accepting joint liability. Cf. United States v. Martin, 274 F. Supp. 1002 (1967), affd. 411 F. 2d 1164 (1969). Under such circumstances, respondent was in no way required to prepare a joint return for petitioner and his wife under section 6020(a). Fraud Penalty, 1954 through 1965 The third issue is whether petitioner is subject to the fraud penalty imposed by section 6653(b). Section 6653 (b) provides, in pertinent part, as follows: (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * The issue of fraud is a question of fact to be determined upon consideration of the entire record. Anson Beaver, 55 T.C. 85, 92 (1970). *159 The burden of 28 proof is upon the respondent to show fraud through clear and convincing evidence. Steiner v. Commissioner, 350 F. 2d 217, 220 (C.A. 7, 1965); Estate of Upshaw v. Commissioner, 416 F. 2d 737 (C.A. 7, 1969). To establish fraud by direct proof of intention is seldom possible. It usually must be gleaned from the conduct of the taxpayer and the circumstances in question. M. Rea Gano, 19 B.T.A. 518, 531 (1930). The required quantum of proof may be satisfied by circumstantial evidence. Plunkett v. Commissioner, 465 F. 2d 299 (C.A. 7, 1972); Powell v. Granquist, 252 F. 2d 56 (C.A. 9, 1958). Willful failure to file a timely return, without more, does not of itself establish the element of fraud. Stoltzfus v. United States, 398 F. 2d 1002 (C.A. 3, 1968); Cirillo v. Commissioner, 314 F. 2d 478, 482 (C.A. 3, 1963). The facts and circumstances surrounding a taxpayer's failure to file must therefore be carefully examined to determine whether an inference of intention to evade tax is warranted. In order to justify a finding of fraud, the circumstances surrounding the failure to *160 file must strongly and unequivocally indicate an intention to avoid the payment of tax believed or known to be owing. Cirillo v. Commissioner, 29 supra. The facts and circumstances surrounding Anderson's failure to file clearly indicate an intent to evade payment of tax for each of the years in question. Petitioner was a successful and intelligent businessman who held positions of significant responsibility with the two corporations for which he worked. He was well aware of his obligation to file income tax returns for the taxable years 1954 through 1965, inclusive. He knew that the amounts withheld from his salary were insufficient to cover the tax owing. He has freely admitted that he was financially capable of paying the additional amounts owing for the taxable years 1955 through 1965. The facts indicate that he also had the ability to pay the additional tax for the year 1954 but chose not to do so lest he deprive his family of the standard of living to which they were accustomed by depleting funds which would ordinarily inure to their benefit. These factors when coupled with petitioner's consistent and continuous failure to file over such an extended period of time, *161 twelve years, lead us to the inescapable conclusion that his failure to file was accompanied by an intent to avoid payment of tax which he knew to be owing 30 Petitioner maintains that he originally failed to file a return for 1954 because he did not want to lower his family's standard of living, yet it is apparent from the record that he never had any intention of ultimately paying the tax due for that year or any subsequent year. Indeed, it appears certain that he would have continued not to file in future years had he not been caught. We also find unconvincing petitioner's explanation that he did not file returns after 1954 because he could not bring himself to truthfully answer the question on the returns asking whether he had filed a return for the prior year. We view such explanation instead as evidence of a desire to conceal his failure to file returns for prior years and thereby make discovery less likely. See Fred N. Acker, 26 T.C. 107, 113 (1956). This impression is reinforced by his admission that he did not file estimated declarations of tax for any of the years in question to avoid the inquiries which might follow with respect to his regular returns. *162 31 Petitioner points to Jones v. Commissioner, 259 F. 2d 300 (C.A. 5, 1958), and James W. Morrell, T.C. Memo. 1971-99, as support for not imposing the fraud penalty. We disagree. The facts are clearly distinguishable. In Jones, there was a definite sense of urgency involved in the taxpayers using his money, much of it borrowed, for expansion of his business and for purchase payments on his home instead of for payment of taxes. There is no sense of urgency in our case. Moreover, the taxpayer's failure to file occurred only over a three year period, not twelve. In Morrell, we found that the taxpayer, unlike petitioner in our case, did ultimately intend to pay his taxes. Indeed, he had begun to prepare his delinquent returns prior to the initial contact by the government. Petitioner contends that he did not have the requisite fraudulent intent not to pay his taxes because he always expected to be caught by virtue of his W-2 Forms being sent to the government. We cannot accept such a statement as a defense to the imposition of the fraud penalty. It merely reflects the recognition on the part of the taxpayer that his game plan of attempting to *163 avoid payment of taxes might fail. See Fred N. Acker, supra. 32 It is true that petitioner was completely cooperative with the representatives of respondent, but only after he was caught. Prior to such time, his course of conduct was clearly aimed at concealing his prior defalcations. Upon careful consideration of the record and based on the foregoing, we find that part of the underpayment for each of the taxable years 1954 through 1965 was due to fraud with intent to evade tax. Estimated Tax Additions, 1954 through 1965 The final issue before the Court is whether petitioner is subject to additions under section 294(d) (1) (A) of the 1939 Code and under section 6654 of the 1954 Code for failure to file a timely declaration of estimated tax for the taxable year 1954 and for underpayment of estimated tax for the taxable years 1955 through 1965, respectively. Turning first to the taxable year 1954, petitioner did not file any declaration of estimated tax for such year as required by section 58 of the 1939 Code. He is, therefore, subject to the additions provided for by 33 section 294(d) (1) (A) unless his failure to file can be shown to be due to "reasonable *164 cause and not to willful neglect." Petitioner was aware of his obligation to file a declaration of estimated tax for 1954 and yet he failed to do so. He has presented the Court with no reason for such failure. We accordingly find that petitioner is subject to the additions provided for under section 294(d) (1) (A) for the taxable year 1954. Turning next to the taxable years 1955 through 1965, petitioner has admitted his failure to file any declarations of estimated tax for such years as required by section 6015 or to make any payments of estimated tax pursuant thereto. Unlike its predecessor under the 1939 Code, section 6654 has no provision relating to reasonable cause and lack of willful neglect. The imposition of additions on any underpayment of estimated tax is therefore mandatory and extenuating circumstances are irrelevant unless the taxpayer can bring himself within one of the exceptions under section 6654(d). Estate of Barney Ruben, 33 T.C. 1071, 1072 (1960). Since 34 petitioner cannot do this, we find that he is subject to the addition under section 6654 for each of the years in question. Petitioner contends, however, that section 6654 is unconstitutional *165 and in violation of the fifth amendment since section 6654 [6] favors farmers and fishermen over other classes of taxpayers by giving them a lower base upon which to compute the additional thereunder. *166 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Anderson originally stated that he thought 1957 was the first year he had failed to file his return. However, in a subsequent interview on June 20, 1967, conducted by Robert H. Henert of the Intelligence Division with respect to Anderson's criminal liability, it was pointed out that there was no record of his having filed a return since 1954. Anderson conceded that was probably about the time he stopped filing his returns. Accordingly, we assume that in referring to 1957 as the first year he failed to file his return, Anderson actually meant 1954. ↩
3. Anderson's reference to his funds not being "in excess" is ambiguous. It could mean that his funds were not in excess of the additional tax due. It could also mean that he did not have any surplusage of funds in excess of what was required to maintain his family's standard of living. We conclude that he meant the latter in view of his subsequent statement that he had enough funds available to pay the additional tax which he believed to be relatively small in amount. ↩
4. Anderson mentioned $1,000 as the standard deduction figure indicating that he contemplated the benefits of a joint return. ↩
5. The major portion of the estimated deductions allowed for these years consisted of sales taxes. The only evidence petitioner presented to support his sales taxes for 1962 and 1963 approximated those incurred in 1964 and 1965. The record indicates that he fully substantiated his sales tax deductions for 1964 and 1965. ↩
6. Section 6654(b) provides, as follows: (b) Amount of Underpayment. - For purposes of subsection (a), the amount of the underpayment shall be the excess of - (1) The amount of the installment which would be required to be paid if the estimated tax were equal to 80 percent (66-2/3 percent in the case of individuals referred to in section 6073(b) relating to income from farming or fishing of the tax shown on the return for the taxable year or, if no return was filed, 80 percent (66-2/3 percent in the case of individuals referred to in section 6073(b), relating to income from farming) of the tax for such year, over (2) The amount, if any, of the installment paid on or before the last date prescribed for such payment. 35 While the due process clause of the fifth amendment is applicable to Federal tax statutes, Congress is given great leeway in carrying out its taxing powers. Brushaber v. Union Pac. R. R., 240 U.S. 1 (1916). A Federal taxing provision is not violative of the fifth amendment unless it classifies taxpayers in such a manner as to be arbitrary and capricious. Barclay & Co. v. Edwards, 267 U.S. 442. 450 (1924). Congress gave farmers and fishermen a lower computation base under section 6654(b) because of the unusual nature of their business and the vagaries inherent therein. Originally, only farmers received special treatment with respect to their estimated taxes. In 1962, however, Congress decided to extend the same treatment to fishermen. The Senate committee made the following comment in approving the amendment: There are several reasons why this different treatment was provided in the case of taxpayers with income from farming. Probably the most important was the recognition that income from farming is particularly difficult to estimate before the end of the year, or at least 36 before the end of the principal crop season. Also, income receipts are likely to be concentrated in the latter part of the year in the case of farming. Furthermore, accurate recordkeeping is probably more of a problem in the case of farming than for most other self-employment income. Your committee believes that the reasons cited above for the different estimated tax treatment for farming apply in most respects in the case of income of individuals from fishing. * * * [S. Rept. No. 1819, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 241, 242]
We do not find that Congress has acted in an arbitrary or capricious way in treating farmers and fishermen differently from other taxpayers with respect to section 6654(b). Accordingly, respondent's determination of the additions under section 6654 for the years in question are upheld. Decision will be entered for the respondent. ↩