T.C. Memo. 1997-112


UNITED STATES TAX COURT


MARK N. AND MARLA R. KANTOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20429-93.                    Filed March 5, 1997.


Mark N. and Marla R. Kantor, pro sese.

<u>Diane R. Mirabito</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined a deficiency in petitioners' Federal income tax for 1982 and the following additions to tax for 1981 through 1985:

| | | Additions to Tax | | |
|------|------------|------------------|------------------|------------------|
| Year | Deficiency | Sec. 6653(b)[1] | Sec. 6653(b)(1)[2] | Sec. 6653(b)(2) |
| 1981 | --- | $18,047 | --- | --- |
| 1982 | $785 | --- | $33,549 | [3] |
| 1983 | --- | --- | 88,803 | [3] |
| 1984 | --- | --- | 41,156 | [3] |
| 1985 | --- | --- | 57,564 | [3] |

[1]Addition is 50 percent of the underpayment as defined in sec. 6653(c).
[2]Addition is 50 percent of the underpayment as defined in sec. 6653(c).
[3]Addition is 50 percent of the interest payable under sec. 6601 with respect to such portion of the underpayment attributable to fraud.

As alternatives to additions to tax for fraud under section 6653(b),[1] respondent determined that petitioners were liable for additions to tax under sections 6651(a)(1) (failure to file) and 6653(a)(1) and (2) (negligence).

Petitioners have conceded the deficiency and the additions to tax under section 6651(a)(1) (failure to file). The issue remaining for decision is whether petitioner Mark N. Kantor (Mark) is liable for additions to tax for fraud for his failure to file timely income tax returns for the years in issue, or in the alternative, whether petitioners are jointly and severally liable for additions to tax for negligence for those years. Respondent has conceded that petitioner Marla R. Kantor (Marla) is not liable for the fraud addition, but contends that, if Mark

---

[1]Unless otherwise identified, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

is not liable for the fraud additions, petitioners are jointly and severally liable for additions to tax for failure to file and negligence.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners were residents of Bellmore, New York, when they filed their petition.

1. Mark's Education, Work Experience, and Drug Use

Petitioners were married in 1969, the year Mark began law school, and have two children. In 1972, Mark graduated from St. John's University-School of Law, ranked ninth in a class of 218. Mark took and passed two tax courses: Federal income tax, and estate and gift tax. In 1972-73, he attended Harvard Law School in a Master of Laws degree program, but failed to complete the program. Mark did not complete a required term paper because of an episode of drug abuse. Although he passed the New York State bar exam, Mark never became a member of the bar.

In 1973, Mark went to work for Goldman, Sachs & Co., and remained employed there until he resigned in 1983. In 1979, Mark became a vice president in the security sales division, where he worked as a restricted stock specialist, brokering deals for wealthy clients to sell large blocks of corporate shares that

were not tradable on a stock exchange.[2]  As one of only two such specialists at Goldman, Sachs & Co., Mark had attained a high-profile position in the firm that led to higher bonuses and overall compensation.  In 1981, his annual gross income amounted to $129,962, due almost entirely to bonuses.

Beginning in 1980, Mark's behavior in the workplace became increasingly erratic because of cocaine and marijuana consumption.  In 1981, in order to minimize the obviousness of his frequent drug-abuse-related absenteeism, Mark transferred to the less demanding position of "sales trader coverer", as part of a 10-person group buying and selling large blocks of stock on the exchanges.  Mark also began to lie to his coworkers and to Marla about his activities and his absences.  In one such absence in 1982, Mark visited Harrah's Casino in Atlantic City by himself, ostensibly to gamble.  Instead, he stayed in his hotel room, using drugs.  On a number of occasions, Mark called Marla from work to say that he was having dinner with clients.  He would then not call again until 3 or 4 a.m. the next morning to say that he would not be home at all.  At other times, having come home late at night, Mark would have trouble getting up in the

---

[2]Also known as "letter stock", so named because the Securities Exchange Commission rules require the purchaser of such stock, which is not registered with the SEC, and thus may not be traded on any stock exchanges, to file a letter with the SEC affirming that it is held for investment and not resale. Downes & Goodman, Dictionary of Fin. & Investment Terms 228 (3d ed. 1991).

mornings.  Despite being confronted during this period by at least one coworker friend who was concerned about his drug use, Mark made no effort to stop abusing drugs.  In 1982 and 1983, during Mark's chaotic last 2 years at Goldman, Sachs & Co., he stopped filing income tax returns.  In 1981, just as his drug use was increasing and his behavior had begun to become more erratic, Mark prepared and filed a joint income tax return for himself and Marla for 1980 that included a detailed income averaging computation.

Although Mark's income continued to rise in 1982 and 1983, he drew his bonuses from a pool based upon the performance of his group as a whole.  The bonus growth was mainly fueled by the resurgent stock market of the early 1980's, and not by Mark's particular expertise and efforts.  In 1982, over $150,000 of Mark's total compensation of $202,385 consisted of bonuses.  In 1983, Mark's income grew to $441,075, although that included deferred compensation received by him when he resigned his position.  Goldman Sachs & Co. earned commissions of $2.5 million to $4.5 million during 1981 to 1983 on transactions that Mark had executed.  During the 1980's, Goldman Sachs & Co. promoted many of Mark's contemporaries to positions of greater responsibility, while Mark was not so promoted.  He remained one of many traders who had a nominal title of vice president.  His career had begun to stall.  During his last couple of years at Goldman Sachs &

Co., Mark also became increasingly anxious about being fired for abusing drugs.

In July 1983, The First Boston Corporation (First Boston) offered Mark a position in its restricted stock group, which was then expanding. Mark accepted the offer as a solution to his perceived problems at Goldman, Sachs & Co., despite his fears of accepting the same sort of demanding job that he had voluntarily abandoned just 2 years earlier.

Mark took his drug abuse habit to First Boston. His behavior became even more erratic. Three days after reporting to work, Mark missed 2 days because he was taking drugs. Thereafter, he canceled a business trip, with the false excuse that his mother had broken her arm. On another occasion, after he had been missing for 2 days, Marla found him at the train station, asleep in the back of his Jeep. In 1984, Mark went to Harrah's Casino in Atlantic City for a second binge of illegal drug use. During visits to Harrah's in 1982 and 1984, Mark wrote checks totaling $12,600. Despite this erratic behavior, First Boston earned commissions in the range of $3.5 million and $5.5 million on transactions that Mark executed in 1984 and 1985. Mark continued as an employee at First Boston until 1989.

2. Petitioners' Lifestyle and Financial Transactions

Despite frequent drug-related absenteeism, Mark focused on keeping his job during the years at issue, first at Goldman, Sachs & Co. and then at First Boston. Mark's earnings, from

which his employers withheld Federal and State income and employment taxes, were petitioners' sole source of support.[3] In the years 1981 to 1985, Mark earned gross income of $129,962, $199,407, $442,517, $243,373, and $317,538, respectively. At home, Marla focused on keeping an air of normality about her life and that of their children by paying the bills and performing other essential tasks, even as she denied the increasing severity of Mark's drug use problem and feared to confront him about it.

Petitioners' family spending pattern remained relatively constant throughout the years in issue. However, the record of their year-by-year expenditures is fragmentary because checks, check registers, and other records are missing for tax years 1981 and 1985.

The record shows that Mark and Marla habitually used cash for much of their consumption during the entire period of 1981 to

---

[3]Mark's employers only withheld a portion of the taxes owed. Petitioners paid substantial additional amounts of taxes due for each year when they eventually filed their delinquent returns on Aug. 26, 1987:

| Year | Amount Withheld | Additional Tax Owed |
|------|-----------------|---------------------|
| 1981 | $28,159 | $7,934 |
| 1982 | 42,891 | 23,421 |
| 1983 | 113,351 | 61,862 |
| 1984 | 57,177 | 25,384 |
| 1985 | 71,533 | 43,596 |

1985, even though they maintained several bank accounts. Funds deposited in these accounts during this period came largely from Mark's earnings and some relatively small returns on investments. In 1982, petitioners made over 200 checks out to cash, some for as much as $4,000. Dozens of the checks were for $100 or more. Both petitioners wrote like numbers of checks to cash in each of the other tax years in question using three different accounts with Chemical Bank; i.e., a checking account and an unidentified second account for the entire period, and a money market account from 1983 to 1985. Marla tended to write her checks to cash for $100 or less, while Mark wrote checks to cash for much larger amounts, including several for $5,000. Mark also drew cash from a First Boston brokerage account and a Dreyfus liquid assets account. Mark used much of the money to purchase illegal drugs.

Mark regularly transferred funds between his various bank accounts, which included brokerage accounts, first at Goldman, Sachs & Co. during the years when he worked there, then at First Boston. These accounts, along with a Dreyfus liquid assets account, served as Mark's vehicles for conducting both his personal spending and his investment activities.

Petitioners paid for three major purchases on credit during the tax years: their house, the lease of the second Mercedes-Benz automobile, and another automobile, a Cadillac, bought in 1980. They missed no payments on any of these three obligations, although some of the payments made on the Cadillac in 1982 and

1983 and some of the lease payments on the Mercedes in 1985 may have been delinquent. Petitioners also regularly used several credit cards, including a Visa card from Chemical Bank. The income tax returns for each year reflect deductions ranging from a high of $2,431 in 1981 to a low of $1,384 in 1985 for credit card interest. Although petitioners began to experience financial difficulties in 1986, they were not dunned by creditors for unpaid bills during 1981 through 1985.

3. IRS Investigation

After petitioners failed to file timely income tax returns beginning in 1982 for tax year 1981, IRS agents contacted Mark on at least three occasions: November 23, 1982, July 18, 1985, and October 23, 1985. Mark contacted the IRS in the wake of at least one of these visits. Thereafter in 1986, the IRS began a criminal investigation of Mark's failure to file income tax returns. On July 24, 1986, agents from the IRS Criminal Investigation Division (CID) interviewed Mark. On August 20, 1987, petitioners mailed income tax returns to the IRS for tax years 1981 through 1985 and paid all taxes shown on the returns and interest through August 19, 1987.[4]

On April 11, 1989, a criminal information was filed against Mark in the U.S. District Court for the Eastern District of New

---

[4]See supra note 3 for excess of taxes owed for each year over amounts withheld. Mark made no additional payments until petitioners delinquently filed their tax returns.

York in the case of <u>United States v. Kantor</u>, charging him with a single count of violating section 7203, in that he willfully and knowingly failed to make at the time required by law an income tax return to the IRS for 1985. Mark pleaded guilty to the charge, and on June 22, 1989, he was sentenced to 2 years' probation and fined $10,000. The terms of probation required Mark to complete 320 hours of community service and "continue to seek drug treatment".

On May 15, 1990, John J. Fitzgerald, an IRS Appeals officer, solicited from petitioners an open-ended extension of the period of limitations for each of the 5 years in issue by sending a form letter with two Forms 872A to petitioner's attorneys, Steven Mastbaum, Michael Feldberg, and Joel Goldschmidt. On June 4, Mr. Fitzgerald renewed the request by sending another form letter requesting that petitioners sign two copies of a Form 872, which would extend the period of limitations for each year by a specified period starting on August 26, 1990, the third anniversary of the date petitioners filed their tax returns.

Mr. Goldschmidt returned the completed Forms 872 to Mr. Fitzgerald on July 25, 1990, with a cover letter stating that he understood that Mr. Fitzgerald had no authority to limit the scope of the extension despite an earlier agreement to do so. The forms, signed by petitioners, and dated July 24, 1990, extended the period of limitations until June 30, 1991. On February 11, 1991, Mr. Fitzgerald sent a request for a second

extension of the period of limitations to Mr. Goldschmidt. On March 19, 1991, Mr. Fitzgerald renewed the request, this time directly to petitioners. On March 21, 1991, petitioners signed and dated the Form 872, which further extended the period of limitations to June 30, 1992. Petitioners signed a third extension on February 26, 1992, which expired on June 30, 1993.

On June 25, 1993, respondent issued a statutory notice of deficiency to petitioners. Petitioners filed a timely petition with the Tax Court.

## OPINION

Respondent determined additions to tax for fraud for each of the 5 years in issue solely with respect to petitioner Mark N. Kantor. Since we find no fraud for any of the years, we address respondent's alternative determinations of negligence, which are against petitioners jointly and severally by reason of their having filed joint income tax returns for the years in issue. Reaching these alternative determinations requires that we address, <u>infra</u> p. 24, petitioners' allegation that the period of limitations expired for each of the tax years in issue because an invalid extension, Form 872, was executed.[5]

---

[5]There is a minor evidentiary issue: Petitioners submitted at trial three letters, labeled petitioners' exhibit 29, that we exclude from evidence as hearsay. Fed. R. Evid. 802. The letters do not fall within the hearsay exception of "records of regularly conducted activity". Fed. R. Evid. 803(6). First, the letters are not entries made during the routine of a business. They were apparently specifically written at Mark's behest to his

(continued...)

1.  Fraud

For tax year 1981, if any part of an underpayment is due to fraud, section 6653(b) imposes an addition to tax of 50 percent of the underpayment.  For this purpose, the underpayment equals the tax required to be shown on the return if a return is delinquently filed.  Sec. 6653(c)(1).  For tax years 1982 to 1985, if any part of an underpayment is due to fraud, section 6653(b)(1) imposes the same addition to tax on the entire underpayment, and section 6653(b)(2) imposes a further addition of 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to fraud. Respondent bears the burden of proving by clear and convincing evidence that an underpayment exists and that part of such underpayment is attributable to fraud.  Sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. on other issues 959 F.2d 16 (2d Cir. 1992); Smith v. Commissioner, 91 T.C. 1049, 1053 n.3 (1988) (citing Rickard v. Commissioner, 15 B.T.A. 316, 317 (1929)), affd. 926 F.2d 1470 (6th Cir. 1991); Stone v. Commissioner, 56 T.C. 213, 220-221 (1971).  The existence of fraud is a question of fact that we resolve

_____

[5](...continued)
attorney or "to whom it may concern".  While the letters were seemingly made by persons with personal knowledge, petitioners have not provided the necessary foundation to ascertain that fact.  Because the letters possess no other, equivalent circumstantial guarantees of trustworthiness, they cannot be admitted into evidence under rule 803(24) of the Federal Rules of Evidence.

separately for each year upon consideration of the entire record. Teitelbaum v. Commissioner, 294 F.2d 541, 547 (7th Cir. 1961), affg. T.C. Memo. 1960-11; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).

An underpayment of tax exists in each year in dispute. Petitioners filed joint returns that show the amounts of tax required to be shown for 1981 and 1983 to 1985, and conceded the deficiency of $785 for 1982. Accordingly, respondent has met her burden of proving the existence of the underpayments. DiLeo v. Commissioner, supra; see also Catalfo v. Commissioner, T.C. Memo. 1995-106, affd. without published opinion 101 F.3d 687 (2d Cir. 1996).

For each year, respondent must also establish petitioner's fraudulent intent by showing a specific intent to evade a tax believed to be owing through conduct intended to conceal, mislead, or otherwise prevent collection. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Comparato v. Commissioner, T.C. Memo. 1993-52. Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income". United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). Fraudulent intent is an actual, intentional wrongdoing, and "the intent required is the specific purpose to evade a tax believed to be owing". Estate of Temple

v. Commissioner, 67 T.C. 143, 159 (1976).  The existence of fraud is a factual question.  Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980).

Fraudulent intent may never be imputed or assumed, but must be proven by independent evidence.  Recklitis v. Commissioner, supra at 909-910 (citing Beaver v. Commissioner, 55 T.C. 85, 92 (1970)); see also Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, supra at 224.  We do not sustain the Commissioner's determination of fraud when we are left with only a suspicion of fraud, Green v. Commissioner, 66 T.C. 538, 550 (1976); see also Comparato v. Commissioner, supra, and even a strong suspicion does not suffice, Drieborg v. Commissioner, 225 F.2d  216, 219-220 (6th Cir. 1955), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Axelrod v. Commissioner, T.C. Memo. 1982-92, affd. without published opinion 711 F.2d 1062 (9th Cir. 1983).

Because direct proof is often difficult to obtain, respondent may use circumstantial evidence to prove a taxpayer's fraud.  Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); see also Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  We examine the taxpayer's entire course of conduct to determine whether respondent has met her burden of

proof of fraud by clear and convincing evidence. Miller v. Commissioner, 94 T.C. 316, 333 (1990); Recklitis v. Commissioner, supra at 909-910.

Weighing and evaluating the objective evidence and taxpayer's testimony in a fraud case can be difficult. Comparato v. Commissioner, supra. To find fraud, we must infer intent "in part from the objective evidence as to * * * [the taxpayers'] actions, which may be ambiguous, and in part from their own testimony, which is almost by definition self-serving." Stone v. Commissioner, 865 F.2d 342, 344 (D.C. Cir. 1989), revg. and remanding Rosenbaum v. Commissioner, T.C. Memo. 1983-113. While we are not obliged to accept the testimony of interested parties, if it is not credible and not corroborated by the evidence, Davis v. Commissioner, 88 T.C. 122, 140-141 (1987), affd. 866 F.2d 852 (6th Cir. 1989), we find both Mark's and Marla's testimony generally credible, strongly supported by the rest of the record, and uncontroverted by respondent.

The courts have developed a nonexhaustive list of the "badges of fraud", Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990), affg. in part and revg. in part an Oral Opinion of this Court; Miller v. Commissioner, supra at 334 (list of badges of fraud is nonexclusive), some of which respondent cited in her brief: (1) Large and consistent understatements of tax; (2) failure to

file income tax returns; (3) dealing in cash; (4) transferring or otherwise concealing funds; (5) petitioner's lack of cooperation with tax authorities.  We use these badges, which are illustrative only, as tools in considering the totality of the facts and circumstances, which in this case includes Mark's admitted illegal drug abuse, to determine the existence of fraudulent intent.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992).

Evidence of emotional or substance abuse problems can rebut evidence of fraudulent intent, either by showing that it prevented the taxpayer from forming the requisite intent, Hollman v. Commissioner, 38 T.C. 251, 259-260 (1962) ("considerable psychiatric evidence" of a severe psychosis overcame other evidence showing taxpayer's "astuteness and awareness of matters" and participation in "intricate financial operations during the tax years"), supplemented by T.C. Memo. 1962-236, or as part of a larger pattern of facts and circumstances that does not present clear and convincing evidence to the court.  Gutierrez v. Commissioner, T.C. Memo. 1995-252 (combination of alcoholism, lax record-keeping, and cooperation with IRS indicated lack of fraudulent intent), affd. in part and revd. and remanded on other issues without published opinion 105 F.3d 651 (5th Cir. 1996).

In other cases, this Court has used the presence of compelling evidence of a taxpayer's acts to mislead and conceal to find fraud, despite evidence of mental illness, Yarbrough

Oldsmobile Cadillac, Inc. v. Commissioner, T.C. Memo. 1995-538 (brain tumor did not prevent finding of fraud when other indicia such as falsified records, disallowed deductions, use of a corporation to disguise personal expenses as business expenses proved fraud), or drug use--even drug addiction; see Maniloff v. Commissioner, T.C. Memo. 1991-554 (testimony of extensive drug use insufficient to rebut other evidence showing participation in fraudulent and illegal activities); Yocum v. Commissioner, T.C. Memo. 1985-447 (drug addiction insufficient to rebut fraudulent intent of taxpayer who engaged in drug smuggling); Chaffin v. Commissioner, T.C. Memo. 1983-394 (drinking problem did not preclude forming fraudulent intent).

Petitioners presented no psychiatric testimony or other evidence of mental impairment caused by drug addiction that prevented Mark from forming the requisite intent.  However, the record is replete with anecdotal evidence that drug abuse played a destructive role in Mark's life long before the years in issue and that it continued throughout those years.  Marla testified about many of these episodes and about her role in helping Mark keep his job, which provided their sole source of income, while Marla tended--as best she could--to their family life.

Against this background of Mark's drug abuse and petitioners' efforts to cope with it, respondent contends that Mark's failure to file income tax returns, which resulted in his pleading guilty under section 7203 for willful failure to file a

return for 1985, frequent writing of checks to cash, and maintenance of an upper-middle-class lifestyle, taken together, prove his specific intent to evade the payment of taxes in the years in issue. We are not convinced, and we hold to the contrary.

The only "badge of fraud" found in the record is Mark's failure to file income tax returns in each of the years 1981 to 1985. Bradford v. Commissioner, 796 F.2d at 307-308. Mark knew he had the obligation to do so; he had filed petitioners' 1980 joint tax return in 1981. Rowlee v. Commissioner, 80 T.C. at 1125. Mark has argued that his drug abuse was the root cause of his failure to file, an argument contradicted to some extent by his filing of the 1980 tax return in 1981, at a time when he already was heavily abusing drugs. However, the record indicates that Mark's erratic behavior during 1980 through 1985, created ever increasing chaos in petitioners' personal lives. Marla testified that the failure to file their tax returns from 1982 to 1986 was a direct byproduct of that chaos.

In 1989, Mark pleaded guilty to a charge that he willfully failed to file his tax return in 1985. Sec. 7203. Such a conviction, without more, does not constitute clear and convincing evidence of fraud for that year, Beaver v. Commissioner, 55 T.C. at 93; Kotmair v. Commissioner, 86 T.C. 1253, 1260-1261 (1986); see also McCullough v. Commissioner, T.C. Memo. 1993-70, although it may be highly persuasive evidence of

fraudulent intent, <u>Farber v. Commissioner</u>, 43 T.C. 407, 420-421 (1965), modified 44 T.C. 408 (1965).  As in <u>Hudgens v. Commissioner</u>, T.C. Memo. 1985-587, and <u>Paddock v. Commissioner</u>, T.C. Memo. 1985-586, we regard Mark's continued failure to file to be an "emotional response" to the chaos caused by years of illegal drug abuse that prevented him from confronting "his situation in any constructive way" and not a series of affirmative acts actuated by an intent to evade paying taxes. <u>Hudgens v. Commissioner</u>, <u>supra</u>.

The other factors cited by respondent do not support a finding of clear and convincing proof of fraudulent intent in any of the tax years in question.  The welter of detail that respondent entered into the record documenting petitioners' expenditures during the years in question merely indicates a relatively affluent, if somewhat undisciplined lifestyle, heedless of the consequences of failing to pay taxes.  The record does not recount a series of affirmative acts demonstrating fraudulent intent.  <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943).  The case at hand contrasts sharply with the taxpayer in <u>Anderson v. Commissioner</u>, T.C. Memo. 1973-155, who told the Court that he did not file his tax returns or pay his taxes because he did not wish to lower his family's standard of living.  Such recalcitrant behavior is absent from the record in this case. Petitioners were merely living their lives without any particular regard for whether they filed their returns and paid their taxes.

Filing tax returns and paying taxes was the last thing on their minds. Mark's disregard for the consequences of his actions was grossly negligent, and may even have been willful, but it does not evidence any attempt to mislead, conceal, or otherwise prevent payment of taxes owed. Webb v. Commissioner, 394 F.2d at 377.

Respondent would also have us hold that petitioners' use of multiple bank accounts and extensive use of checks written to cash was a continued effort to conceal income. Petitioners openly conducted their affairs and concealed nothing, as attested by the wealth of minutiae in the record that respondent gathered. The sources of their funds were known and easy to trace: Mark's salary and bonuses earned during the tax years in question, from which substantial amounts of tax had been withheld and W-2 Forms issued by his employers as required by law. Secs. 3101, 3402, 6051; cf. Stoltzfus v. United States, 398 F.2d 1002, 1005 (3d Cir. 1968) (self-employed taxpayer who failed to file his tax returns for 16 years, knew that he owed taxes in those years, also did not make any payments of estimated tax during this period, and further delayed filing returns out of fear of prosecution, was denied refund for additions to tax due to fraud). Mark's behavior did not contain the critical element of deceit or concealment that the actions of the taxpayer in Stoltzfus v. United States, supra, displayed. Mark did nothing to prevent taxes from being withheld. Cf. Weber v. Commissioner,

T.C. Memo. 1995-125. That the withholdings were less than his required estimated tax payments under section 6654 does not establish fraud.

That Mark was well educated, financially sophisticated, and conversant with his responsibilities under the Code is incontrovertible. Sophistication and knowledge are relevant only in concert with other, substantive indicia of fraud. Beaver v. Commissioner, supra at 93; see also O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969) (background of experience, knowledge, and ability acquired as a certified public accountant relevant in light of wealth of other evidence that demonstrated taxpayer's bad faith with intent to defraud), affg. on this point T.C. Memo. 1967-174. In the circumstances of this case, Mark's background does not persuade us that his failure to file was actuated by fraudulent intent.

Respondent also alleged that Mark failed to cooperate with the Service in its investigation. Uncooperativeness can indicate fraud. Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63. However, respondent produced no evidence on this score other than an unsubstantiated allegation that Mark failed to respond to a single attempted contact in 1982, which the IRS itself failed to follow up. Mark responded to the next IRS contact made 3 years later, in 1985. Petitioners' eventual filing of tax returns in 1987 and

subsequent willingness to execute extensions to the period of limitations do not indicate a willful failure to cooperate.

Like the taxpayer in Gutierrez v. Commissioner, T.C. Memo. 1995-252, affd. in part and revd. and remanded on other issues without published opinion 105 F.3d 651 (5th Cir. 1996), Mark was irresponsible and heedless in his actions. But the record is bereft of meaningful badges of fraud other than a failure to file itself and fails to support even a strong suspicion of fraudulent intent. Drieborg v. Commissioner, 225 F.2d at 219-220; Axelrod v. Commissioner, T.C. Memo. 1982-92, affd. without published opinion 711 F.2d 1062 (9th Cir. 1983).

2. Other Issues Bearing on Liabilities for Additions to Tax

    i. Period of Limitations

Preliminary to determining whether petitioners are liable for additions to tax in the alternative, we briefly address whether respondent timely issued the notice of deficiency to petitioners within the statutory period of limitations. Unless an exception applies, as in the case of a fraudulent return, sec. 6501(c)(1), or where no tax return is filed, sec. 6501(c)(3), the IRS must assess an income tax within 3 years after the taxpayer files a return, sec. 6501(a). The taxpayer and the IRS may agree to extend this period by executing a written agreement prior to the expiration of the period of limitations. Sec. 6501(c)(4). In deciding that the statutory period for assessing or collecting a tax deficiency has expired, this Court decides on the merits

that no such deficiency exists.  Sec. 7459(e);[6] <u>United Business Corp. of Am. v. Commissioner</u>, 19 B.T.A. 809, 832 (1930), affd. 62 F.2d 754 (2d Cir. 1933).

Petitioners must raise in their pleading the affirmative defense that the statutory period of limitations has expired. Rule 39; <u>Mecom v. Commissioner</u>, 101 T.C. 374, 382 (1993), affd. 40 F.3d 385 (5th Cir. 1994); <u>Amesbury Apartments, Ltd. v. Commissioner</u>, 95 T.C. 227, 240 (1990).  They failed to do so, attempting to raise the issue only in their Request for Admissions.  However, the issue was tried by implied consent of the parties, and we will rule on the merits.  Rule 41(b).

Petitioners have made a prima facie case by proving the filing date of the income tax returns, August 26, 1987, and that the statutory notice of deficiency was mailed more than 3 years thereafter, on June 25, 1993, thereby shifting the burden of going forward to respondent.  <u>Robinson v. Commissioner</u>, 57 T.C. 735, 737 (1972); see also <u>Ribb v. Commissioner</u>, T.C. Memo. 1988-379.  Respondent discharged that burden by showing that the parties executed three facially valid extensions to extend the period of limitations to June 30, 1993, <u>Concrete Engg. Co. v.</u>

---

6           SEC. 7459(e).  Effect of Decision That
        Tax Is Barred By Limitation.--If the
        assessment or collection of any tax is barred
        by any statute of limitations, the decision
        of the Tax Court to that effect shall be
        considered as its decision that there is no
        deficiency in respect of such tax.

Commissioner, 19 B.T.A. 212, 221 (1930), affd. 58 F.2d 566 (8th Cir. 1932), shifting the burden back to petitioners to affirmatively show the invalidity of those written consents. Crown Willamette Paper Co. v. McLaughlin, 81 F.2d 365, 367 (9th Cir. 1936); Concrete Engg. Co. v. Commissioner, supra at 221. Petitioners always retain the ultimate burden of persuasion because they raised the issue that the assessment is barred by the statute of limitations. Kronish v. Commissioner, 90 T.C. 684, 692 (1988).

Petitioners raised two arguments. First, they questioned whether the date next to their signatures on the first Form 872 consent, signed on July 24, 1990, is in the same handwriting as that in the later two consents. Their argument in that respect appears to be that the consent was not properly executed and was therefore invalid. However, petitioners have produced no evidence other than their vague allegations about the differences in handwriting to support their contention. We find that the consent appears regular on its face and in accordance with the law. In the absence of contrary evidence, we find it to be valid. Concrete Engg. Co. v. Commissioner, supra at 221.

Next, petitioners allege that respondent's Appeals officer purportedly agreed with petitioners to drop the fraud penalty in return for extending the period of limitations. The record shows that the parties never reached a formal closing agreement, sec. 7121; sec. 601.202, Statement of Procedural Rules, and

petitioners have not shown that the Appeals officer had the authority to enter into any other promises or bargains that may have been reached, Klein v. Commissioner, 899 F.2d 1149, 1152 (11th Cir. 1990) (statutory requirements of closing agreements are exclusive and strictly construed).  We find that petitioners have not discharged their burden of proof and have failed to show that any of the written consents were invalid.  Kronish v. Commissioner, supra at 692.  Respondent issued the notice of deficiency to petitioners within the period of limitations as extended by petitioners' consents.

### ii.  Negligence

As an alternative to fraud for each of the tax years in question, respondent determined a 5-percent addition to tax on underpayments, sec. 6653(a)(1), and for the years 1982 through 1985 an additional penalty of 50 percent of interest due on the underpayment under section 6653(a)(2), based on her determination of petitioner's negligence.  Section 6653(c)(1) defines an underpayment for purposes of this section as the excess of the amount of tax required to be shown on the return over the amount of tax shown on the return, except that the amount of tax shown is disregarded if the return was not filed within the prescribed time period.  Negligence is defined as the lack of due care or failure to do what an ordinarily prudent person would do under the circumstances.  Bassett v. Commissioner, 67 F.3d 29, 31 (2d Cir. 1995), affg. 100 T.C. 650 (1993); Marcello v. Commissioner,

380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964).  The failure of taxpayers, without reasonable cause, to comply with the statutory duty to timely file returns, sec. 6072(a), violates that duty and is probative of negligence, Sullivan v. Commissioner, 985 F.2d 704, 706 (2d Cir. 1993), affg. in part and revg. in part on another issue T.C. Memo. 1991-492; Crocker v. Commissioner, 92 T.C. 899, 917 (1989); Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990).  Petitioners bear the burden of showing that they were not negligent.  Rule 142(a); Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480.

Petitioners did not contend at trial or on brief that their actions in failing to timely file their returns were not negligent.  For 1985, they are collaterally estopped from contending otherwise because of Mark's conviction under section 7203 for a willful failure to make a return.  Kotmair v. Commissioner, 86 T.C. 1253, 1263 (1986).  Petitioners have failed to show that their failure to file a tax return for any of the years in issue was not negligent.  Petitioners are liable for additions to tax under section 6653(a) for each of the tax years in question.

To reflect the foregoing,

Decision will be entered under Rule 155.